UNITED STATES of America,
Plaintiff-Appellee,

v.

Graham Lee KENDALL,
Defendant-Appellant.

No. 83–1908.

United States Court of Appeals,
Tenth Circuit.

July 3, 1985.

Carl Hughes, Oklahoma City, Okl., for defendant-appellant.

Teresa Black, Asst. U.S. Atty., Oklahoma City, Okl. (William S. Price, U.S. Atty., and James F. Robinson, Asst. U.S. Atty., Oklahoma City, Okl., on brief), for plaintiff-appellee.

Before SETH, BREITENSTEIN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Graham Lee Kendall was indicted on one count of conspiracy to possess marijuana with intent to distribute, 21 U.S.C. §§ 841(a)(1), 846 (1982) and 18 U.S.C. § 2 (1982), one count of conspiracy to import marijuana, 21 U.S.C. §§ 952, 963 (1982) and 18 U.S.C. § 2, and one count of violating the Travel Act, 18 U.S.C. § 1952 (1982). After a jury trial, he was convicted of one count of conspiracy to possess marijuana with intent to distribute and one count of violating the Travel Act. On appeal, he argues that: (1) the evidence is insufficient to support a finding of guilt for conspiracy to possess marijuana with intent to distribute; (2) the Government failed to prove interstate travel or the existence of a business enterprise within the meaning of the Travel Act; (3) the trial court erred in admitting evidence of crimes or acts not charged in the indictment; and (4) the Government's refusal to disclose evidence of other crimes, wrongs, or bad acts before trial violated his Fifth Amendment right to due process and his Sixth Amendment right to confrontation and cross-examination. We disagree and affirm.

## I.

## BACKGROUND

In setting forth the circumstances giving rise to this appeal, we view the evidence in the light most favorable to the jury's verdict. *United States v. Petersen*, 611 F.2d 1313, 1317 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980).

In August 1981, Larry Carr approached Patrick Callihan with the suggestion that the two of them buy an airplane and enter the drug smuggling business. Carr and Callihan had previously been associated in an unsuccessful business venture and both were in desperate need of money. Callihan initially balked at the idea but, in the early summer of 1982, they agreed to try to find an airplane and sources of employment in the drug trade. Callihan, an experienced pilot, knew defendant Kendall from earlier legitimate aircraft dealings. Kendall was an experienced and very successful airplane dealer, with contacts around the country and an industry-wide reputation for his knowledge and expertise.

In June 1982, Carr and Callihan traveled to Oklahoma City to talk with Kendall at his place of business, Oklahoma Aircraft, located at Page Airport near Oklahoma City. During this meeting, Callihan and Carr asked Kendall about the availability of various aircraft, including their long-range fuel capacities and useful load capabilities. Callihan told Kendall that he and Carr were planning to smuggle and that they were looking for a long-range airplane with plenty of room for hauling marijuana. Kendall described several aircraft but, because neither Carr nor Callihan were qualified to fly these particular planes, and because Kendall insisted on cash-only terms for the purchase of a plane, Callihan and Carr decided to look elsewhere.

Sometime later, Callihan and Carr, through fraudulent means, purchased a

Piper Navajo Chieftain aircraft in Las Vegas from a party unrelated to Kendall. They flew this plane back to Oklahoma Aircraft. Upon their arrival Callihan noticed a bladder fuel tank (which can be installed within a plane to increase its range) positioned on a forklift inside Kendall's hangar. Callihan first spoke with an individual named Les, and then with Kendall, about purchasing the bladder and having it installed in his plane. Kendall told Callihan to see Les, and Callihan paid Les to install the bladder. During this same visit, Kendall showed Callihan an aircraft owned by William Geittmann, an acquaintance of Kendall. Kendall pointed out the plane's long-range fuel capabilities and recommended the fuel system to Callihan, noting that it was particularly well suited for trips to South America.

In July 1982, Callihan and Carr took part in an unsuccessful attempt to smuggle marijuana into the United States from Mazatlan, Mexico. Failing in this venture, they flew back to Oklahoma Aircraft and had Les remove the bladder from the plane. While Callihan's plane was sitting in the hangar at Oklahoma Aircraft, Geittmann saw the plane and noted that it was well suited to smuggling. Geittmann, a longtime and very successful drug smuggler, asked Kendall about Callihan's plane and whether the owner might be interested in flying for him. Kendall told Geittmann that he knew Callihan wanted to work and was available. Sometime during this period, Kendall also asked Geittmann to check the registration numbers of Callihan's plane while Geittmann was in Mexico, to determine if the plane was "hot" and whether the Mexican police had spotted the registration tail numbers or were looking for the plane. Kendall told Geittmann that the plane had been fired upon in Mexico when Callihan had earlier tried to pick up the load of marijuana near Mazatlan.

During his stay at Oklahoma Aircraft, Callihan spoke with Kendall and asked about the possibility of working on a smuggling venture with Geittmann. Having known Geittmann since 1974, Kendall spoke highly of him and told Callihan that the two of them would work well together. Kendall then drove Callihan to a nearby pay phone to call Geittmann. En route to the pay phone Callihan offered Kendall twenty percent of any deal he made with Geittmann. Kendall then placed a long distance call to Geittmann using his telephone credit card. After telling Geittmann that he had someone he wanted him to talk to, Kendall hung up to await a return call. When Geittmann called several minutes later Kendall answered and spoke to him, recommended Callihan as reliable and trustworthy, and then handed the telephone to Callihan.

Geittmann and Callihan arranged to talk further and on August 3, 1982, Geittmann called Callihan to arrange a meeting at Geittmann's home in Aspen, Colorado. Callihan called Kendall to tell him of this scheduled meeting, and Kendall expressed his approval. On August 4, Callihan traveled on a commercial flight from Oklahoma City to Aspen, where he was met by Geittmann. Callihan and Geittmann discussed flying marijuana and cocaine into the United States. They agreed that Callihan would fly and provide the aircraft and related servicing, while Geittmann would provide the financing, ground crew, facilities, and security in Mexico and South America. No specific trip was arranged, but Geittmann told Callihan he would contact him very soon. During this meeting, Geittmann received a telephone call from Kendall. Kendall told Geittmann that he had discovered a few things about Callihan he didn't like and that Callihan was not trustworthy. Geittmann informed Callihan that there was a problem with Kendall. Callihan and Kendall subsequently met in Oklahoma City to settle their differences and each separately telephoned Geittmann to inform him of the settlement.

Several days after his return to Oklahoma City, Geittmann contacted Callihan and told him that a smuggling trip had been arranged. On about August 10, Geittmann sent two men to Oklahoma City to serve as a ground crew for the venture. The two men, David Zamansky and Edward

Hoban, met with Callihan and Carr and they all visited a proposed landing site in southwestern Oklahoma. Callihan then had the bladder reinstalled in his plane, informed Kendall of the installation, and with Kendall's permission, stored the refitted plane at Oklahoma Aircraft.

On August 18, Callihan and Carr flew their plane to Cancun, Mexico. There they met Geittmann, who had arranged for their arrival in Cancun, had bribed several local officials, and had scheduled their departure to South America. On August 20, 1982, Callihan and Carr flew to Bananquilla, Colombia, loaded their plane with approximately 1,500 pounds of marijuana, and returned to Cancun. They departed Cancun for the United States on August 21. Their destination was Oklahoma but because of severe weather, they diverted to Louisiana. Upon landing in Louisiana, they were immediately arrested by government agents.[1]

Callihan and Carr, unindicted co-conspirators in this case, were indicted in Louisiana and pleaded guilty as part of an agreement to testify against Geittmann and Kendall. Geittmann, Zamansky, Hoban, and Kendall were indicted on various counts of conspiracy, narcotics violations, and Travel Act violations. Zamansky and Geittmann also agreed to testify against Kendall at trial.

## II.

### SUFFICIENCY OF THE EVIDENCE

Kendall first argues that there is insufficient evidence to prove that he knowingly and willfully joined in a conspiracy to possess marijuana with the intent to distribute. He also argues that the evidence that does exist supports only a conviction for conspiracy to import marijuana, a charge of which he was acquitted, and that a conviction for conspiracy to possess with intent to distribute is impermissibly inconsistent. In reviewing a criminal conviction, we examine the evidence in the light most favorable to the Government in order to determine whether the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, is substantial enough to establish guilt beyond a reasonable doubt. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Pilling,* 721 F.2d 286, 288 (10th Cir.1983) *United States v. Twilligear,* 460 F.2d 79, 81–82 (10th Cir.1972).

██ A conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The evidence must show circumstances to warrant a jury finding that the conspirators had a unity of purpose or a common design and understanding. *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d 444, 450–51 (10th Cir.1984). In a conspiracy prosecution, the critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists. *United States v. Butler,* 446 F.2d 975, 979 (10th Cir.1971); *Nolan v. United States,* 423 F.2d 1031, 1047 (10th Cir.1969), *cert. denied,* 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970); *Jones v. United States,* 251 F.2d 288, 290 (10th Cir.), *cert. denied,* 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715 (1958). The conspiracy is complete "when one or more of the conspirators knowingly commit an act in furtherance of the object of the agreement." *United States v. Thomas,* 468 F.2d 422, 424 (10th Cir.1972), *cert. denied,* 410 U.S. 935, 93 S.Ct. 1389, 35 L.Ed.2d 599 (1973). The agreement need not be shown to have been explicit. It may be inferred from the facts and circumstances of the case. *Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1289 n. 10 (1975); *United States v. Metropolitan Enterprises, Inc.,* 728 F.2d at 451; *United States v. Dumas,* 688 F.2d 84, 86 (10th Cir.1982). The evidence must show

---

**1.** The plane had been under constant surveillance through the use of a transponder devise previously installed at Oklahoma Aircraft pursuant to a court order.

that Kendall knew a conspiracy to possess marijuana with intent to distribute existed and that he knowingly participated in the conspiracy. *Id.; see also United States v. Butler,* 446 F.2d at 978.

■ The record contains sufficient evidence that Kendall knew Carr and Callihan had agreed to possess and smuggle marijuana. Callihan and Carr carried out an elaborate scheme to obtain an airplane. According to Callihan, he told Kendall that he and Carr wanted to buy a plane to smuggle marijuana, and both Carr and Callihan testified to a lengthy conversation with Kendall concerning the quantity of marijuana various planes could hold. Callihan testified that Kendall showed him the plane belonging to Geittmann, that Kendall specifically mentioned this plane's fuel capacity and recommended it as a good plane for smuggling from South America, and that Kendall told him it was just what he needed. He also testified that Kendall knew about the installation of the fuel bladder and that Kendall directed him to the person who actually installed the bladder.

In addition, Geittmann testified that Kendall asked him to check the registration numbers of Callihan's plane in Mexico after Carr's and Callihan's ill-fated venture in Mazatlan. Given the quantity of marijuana which Carr and Callihan intended to possess and smuggle, 1,500 pounds, intent to distribute could reasonably be inferred. *See, e.g., United States v. Hudson,* 717 F.2d 1211, 1213 (8th Cir.1983); *United States v. Miller,* 693 F.2d 1051, 1054 (11th Cir.1982); *United States v. Goldstein,* 635 F.2d 356, 362–63 (5th Cir.1981); *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *United States v. Rodriguez,* 585 F.2d 1234, 1246 (5th Cir.1978), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980), *aff'd on rehearing en banc,* 612 F.2d 906 (5th Cir.1980).

The Government also sought to establish the extent of Kendall's knowledge and familiarity with Geittmann's smuggling activities and influence. Callihan testified that Kendall responded favorably to his request for an introduction to Geittmann and that Kendall noted Geittmann's reputation for paying his bills, keeping his word, and being the "most active young man in the [drug smuggling] business." Rec., vol. VIII, at 203. Callihan testified that when Kendall showed him a plane specially "plumbed" for long-range smuggling operations, Kendall specifically told him it belonged to Geittmann. Geittmann testified that he had purchased three airplanes from Kendall in 1982, that on one occasion Kendall showed him an aircraft specially "plumbed" for long-range flights, and that he bought the plane because of this feature. As noted earlier, Geittmann testified that Kendall asked him to use his Mexican connections and influence in securing, through bribery, the release of a plane of Kendall's which had been confiscated by Mexican authorities. He also testified that Kendall, during a phone conversation with Geittmann, remarked that he knew Geittmann "overpaid everybody" that worked with him in the drug business. Rec., vol. X, at 593.

Kendall admitted that he knew of Geittmann's prior involvement in drug smuggling, that Geittmann had told him that he had "a reputation for fixing things in Mexico," rec., vol. XII, at 915, and that Kendall had relied on Geittmann's influence in Mexico in the past, including the use of bribery to recover the plane confiscated in Mexico. Finally, Kendall testified that when he introduced Callihan to Geittmann, he knew that Geittmann needed a pilot.

Neither Kendall's knowledge alone nor his mere association with the conspirators, however, is enough to convict him of conspiracy. *See Jones v. United States,* 365 F.2d 87, 89 (10th Cir.1966). The evidence must also show that Kendall knowingly joined the conspiracy, or knowingly and intentionally committed an act in furtherance of it. *United States v. Butler,* 446 F.2d at 979; *Jones,* 365 F.2d at 88. The Government argues that Kendall's introduction and recommendation of Callihan to Geittmann constituted knowingly joining or acting in furtherance of the conspiracy.

The telephone call is the crux of the Government's case against Kendall. Kendall contends that assisting Callihan to contact Geittmann cannot reasonably be construed as joining or furthering a conspiracy. We disagree. Although sharply disputed by Kendall, Callihan testified that on the way to the pay phone after Kendall had agreed to telephone Geittmann, he offered Kendall twenty percent of any deal he made with Geittmann in exchange for Kendall's servicing of the plane and the fuel bladder. According to Callihan, Kendall told him he didn't require any part of the deal. Callihan also testified that he told Kendall of his planned meeting in Colorado with Geittmann and that Kendall expressed his approval. Geittmann testified that Kendall recommended Callihan highly, and that he relied on Kendall's recommendation in deciding to meet with Callihan and in choosing him as the pilot for the smuggling scheme. Geittmann also testified that while he and Callihan were meeting in Aspen, Kendall called Geittmann to alert him that he had done some checking on Callihan and didn't trust him. In addition, other evidence suggested an ongoing business and personal relationship with Geittmann that Kendall wished to preserve.

The Government contends that this evidence supports its claim that Kendall was an indispensable part of Callihan's and Carr's, and subsequently Geittmann's plan to possess, import, and distribute marijuana. The Government argues that without Kendall's help, Callihan would not have been able to carry out his plan and that Kendall, in introducing Callihan to Geittmann, acted with the intent to further the goal of the conspiracy. We agree that there is sufficient proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury could reasonably conclude that Kendall knowingly joined, or knowingly and intentionally committed an act in furtherance of the conspiracy.

■ Kendall argues that his acquittal on the charge of conspiring to import marijuana is a fatal inconsistency in this case. He contends that any evidence that does exist supports only a finding of knowledge and assistance of importation, not possession with intent to distribute. According to Kendall, acquittal on the importation conspiracy charge requires reversal of the conviction for conspiracy to possess. We are not persuaded. It is well established that inconsistency in a verdict is not a sufficient reason for setting it aside. *United States v. Powell*, —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932); *United States v. Spitz*, 678 F.2d 878, 882 (10th Cir.1982); *Lowther v. United States*, 455 F.2d 657, 663 (10th Cir.), *cert. denied*, 409 U.S. 857, 93 S.Ct. 139, 34 L.Ed.2d 102 (1972). "[I]t is not a proper appellate function to attempt to analyze the collective mind of a jury." *United States v. Dennett*, 551 F.2d 261, 262 (10th Cir.1977). Because there is sufficient evidence to support a verdict of guilty of conspiracy to possess with intent to distribute marijuana, Kendall's acquittal on the importation charge does not require reversal.

### III.

### TRAVEL ACT

Kendall next argues that the evidence fails to show a violation of the Travel Act, § 18 U.S.C. § 1952.[2] Kendall does not dispute that Callihan traveled in interstate

---

2. 18 U.S.C. § 1952 provides in pertinent part: "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—...
　(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs ... (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
(b) As used in this section 'unlawful activity' means (1) any business enterprise involving ... narcotics or controlled substances ... offenses in violation of the laws of the State in which they are committed or of the United States ...."

commerce with the intent to perform or facilitate unlawful activity, or that Callihan later performed an illegal act. He does argue, however, that the evidence fails to show either (1) that he "caused" Callihan's interstate travel, or (2) the existence of a business enterprise within the meaning of the Travel Act.

■ Kendall contends the evidence shows only that he placed an interstate telephone call to Geittmann on Callihan's behalf. He asserts there is no evidence that he knew Callihan planned interstate travel to meet with Geittmann, or that he directed, requested, or suggested that Callihan travel anywhere for any purpose. We disagree. The evidence in the record supports the reasonable inference that Kendall, knowing both Callihan's desire to be hired as a pilot for marijuana smuggling and Geittmann's need for a pilot and plane, introduced the two men for the purpose of assisting them in an illegal narcotics venture. This introduction, in the context of this case, constitutes a sufficient causal connection necessary for a violation of 18 U.S.C. § 2.[3]

■ We are also unpersuaded by Kendall's argument concerning the extent of his knowledge of interstate travel by Callihan. The evidence supports a reasonable inference that Kendall, knowing that Geittmann did not live in Oklahoma at the time of the introduction, could reasonably have known or anticipated that Callihan and Geittmann would have to meet to arrange the details of the smuggling trip and that interstate travel for this purpose was very likely. There is no requirement in the Travel Act that a defendant or co-conspirator have knowledge of the intended interstate means. *United States v. Barbieri,* 614 F.2d 715, 720 (10th Cir.1980); *see also, United States v. Villano,* 529 F.2d 1046, 1054 (10th Cir.), *cert. denied,* 426 U.S. 953,

96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976); *United States v. LeFaivre,* 507 F.2d 1288, 1297–98 (4th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). Where there is sufficient proof that travel was apparent and interstate travel not unlikely, it was not necessary under section 1952 to prove further that Kendall knew he was causing or aiding and abetting interstate travel. *United States v. Villano,* 529 F.2d at 1054.

Kendall next argues that the evidence fails to show the existence of a "business enterprise" within the meaning of section 1952(b)(1) because Callihan and Geittmann attempted only one smuggling venture. He argues that a Travel Act "business enterprise" cannot be predicated on one illegal act.

■ The Travel Act defines unlawful activity to include "any business enterprise involving ... narcotics or controlled substances." 18 U.S.C. § 1952(b)(1). The term "business enterprise" means a continuing course of conduct rather than sporadic casual involvement in a proscribed activity. *Rewis v. United States,* 401 U.S. 808, 811 n. 6, 91 S.Ct. 1056, 1059 n. 6, 28 L.Ed.2d 493 (1971); *United States v. Corbin,* 662 F.2d 1066, 1072 (4th Cir.1981); *United States v. Donaway,* 447 F.2d 940, 944 (9th Cir.1971); *United States v. Pauldino,* 443 F.2d 1108, 1112 (10th Cir.), *cert. denied,* 404 U.S. 882, 92 S.Ct. 212, 30 L.Ed.2d 163 (1971); *United States v. Zizzo,* 338 F.2d 577, 580 (7th Cir.1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965). In deciding whether Callihan's actions constitute a continuing course of conduct, we are guided by the legislative history and policies underlying the Travel Act. As the Supreme Court pointed out in *Rewis,* the legislative history of the Act is limited but does reveal that

---

**3.** Title 18 U.S.C. § 2 is the federal aiding and abetting statute, which states:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, ...

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal...."
Although the indictment did not expressly cite 18 U.S.C. § 2, Kendall was specifically charged with "causing" a violation of the Travel Act.

section 1952 was aimed primarily at organized crime and specifically at persons residing in one state while operating illegal activities in another. 401 U.S. at 811–12, 91 S.Ct. at 1059–60. The reach of the statute is not, however, limited to such circumstances. *See Erlenbaugh v. United States*, 409 U.S. 239, 247 n. 21, 93 S.Ct. 477, 482 n. 21 (1972); *United States v. Villano*, 529 F.2d at 1052–53.

■ Callihan and Geittmann fall within the category of persons residing in one state while operating illegal activities in another. In addition, Callihan and Carr both testified that they agreed and intended to get into the business of smuggling. They concocted an elaborate scheme by which to obtain an airplane and actively sought out employers for their services. They had already attempted to smuggle marijuana from Mexico only shortly before Callihan met with Geittmann to plan their smuggling venture. This was Callihan's and Carr's second attempt to smuggle marijuana, and Callihan testified that when he returned to Oklahoma City after his meeting in Aspen with Geittmann, he told Kendall that the two had discussed three future ventures. This evidence indicates a continuing course of unlawful conduct and not a lone, isolated attempt or casual involvement.

This conclusion is supported by *United States v. Davis*, 666 F.2d 195 (5th Cir.1982), where the court upheld a finding of a business enterprise despite the fact that only one illegal drug transaction was proven. The court emphasized the continuing nature of the defendants' relationship in illegal drug trafficking and the prior involvement of one defendant in other illegal drug transactions. *Id.* at 202. In *United States v. Corbin*, 662 F.2d at 1072–73, the court reversed a Travel Act conviction of two defendants who had been arrested immediately after a commercial airline flight while in possession of a large quantity of illegal drugs. In *Corbin*, however, the only evidence offered to prove the existence of a business enterprise was the large quantity of drugs involved, and the court refused to accept this as sufficient proof of a continuous course of conduct. It emphasized that no evidence was introduced to prove either defendant had distributed drugs in the past or planned to do so in the future, that neither defendant was connected to an ongoing enterprise, and that there was no evidence concerning the source or the price of the drugs. The court characterized the defendants' activity as one isolated possession, and thus outside the scope of the Travel Act.

In the instant case evidence was introduced to show Callihan's past smuggling-related activities, Callihan's plans for future smuggling, and Geittmann's long-standing and wide-ranging smuggling activities. This was a large, complex, and lucrative smuggling venture involving a large quantity of marijuana and a large number of people in the United States, Mexico, and Colombia. The entire venture was set in motion when Callihan contacted Geittmann and then flew to Colorado to meet with him. We believe that this is precisely the use of interstate facilities and illegal activity that Congress sought to prohibit in enacting the Travel Act. There was sufficient evidence to show that Kendall caused Callihan to violate the Travel Act and that the smuggling venture was a "business enterprise" within the meaning of the Act.[4]

## IV.

### *Evidence of Other Wrongs*

Kendall next argues that the trial court erred in admitting evidence of his alleged

---

4. Kendall's reliance on *United States v. Donaway*, 447 F.2d 940 (9th Cir.1971), is misplaced. In *Donaway*, the defendant was convicted of violating the Travel Act by placing one bet with a bookie who was part of a much larger conspiracy to fix horse races. The defendant had no other connection with any members of the conspiracy and was acquitted of the conspiracy charge. The court, in refusing to characterize this conduct as engaging in an illegal business enterprise, emphasized the one bet and the absence of any other participation by the defendant. Clearly, such conduct is more accurately described as casual, or sporadic, and thus not within the scope of the Travel Act.

earlier crimes, wrongs, or acts. He contends that such evidence was not admissible to prove his character and did not come within any purpose permissible under Fed. R.Evid. 404(b); that even if relevant, the value of such evidence was substantially outweighed by the danger of unfair prejudice, citing Fed.R.Evid. 403; and that the admission of such prejudicial evidence was an abuse of discretion requiring a new trial. Because the evidence was crucial to the Government's case against Kendall and because this claim raises serious evidentiary issues, we review the evidence and the actions of the trial court in detail.

 Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."[5] Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.; United States v. Biswell*, 700 F.2d 1310, 1317 (10th Cir.1983); *United States v. Nolan*, 551 F.2d 266, 270 (10th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977); *United States v. Freeman*, 514 F.2d 1184, 1189–90 (10th Cir.1975); *United States v. Parker*, 469 F.2d 884, 889 (10th Cir.1972). In *Nolan*, we enumerated some guidelines to test whether evidence of such crimes or acts should be admitted. The evidence (1) must tend to establish intent, knowledge, motive, identity, or absence of mistake or accident; (2) must also be so related to the charged offense that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident; and (3) must have real probative value, not just possible worth. 551 F.2d at 271. The uncharged crime or act must also be close in time to the crime charged. *Id.* at 272. *See also United States v. Burkhart*, 458 F.2d 201, 204 (10th Cir.1972) (en banc). This court has previously stated:

"[E]ven relevant evidence should be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice.' While trial courts have discretion in striking the balance between probative value and unfair prejudice, ... they must be particularly sensitive to the potential prejudice that is always inherent in evidence of an accused's prior uncharged crimes or wrongs.... Although Rule 403 provides broad umbrella protection from unfair or undue prejudice, the specific provision in Rule 404(a) prohibiting evidence of uncharged crimes to show bad character or tendencies toward criminality not only reflects the special danger of other crimes evidence but should alert trial courts to be particularly careful in admitting such evidence."

*United States v. Carleo*, 576 F.2d 846, 849 (10th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978) (citations omitted).

 In *Biswell*, we reviewed the problems associated with Rule 404(b) evidence and the standards governing its use. In an effort to ensure that such evidence is not used in an unfair or impermissible manner, we held that where evidence is offered under Rule 404(b), the Government bears the burden of showing how the proffered evidence is relevant to one or more issues in the case. 700 F.2d at 1317. The *Biswell* standard is clear. The Government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts. In addition, the trial court must specifically identify the purpose for which such evidence is offered and a broad statement merely invoking or restating Rule 404(b) will not suffice. A specific articulation of the relevant purpose and specific inferences to be drawn from each proffer of evidence of other acts will enable the trial

---

**5.** To fall within the scope of 404(b), an act need not be criminal, so long as it tends to impugn a defendant's character. *United States v. Terebecki*, 692 F.2d 1345, 1348 n. 2 (11th Cir.1982); *United States v. Beechum*, 582 F.2d 898, 902 n. 1 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Cooper*, 577 F.2d 1079, 1087–88 (6th Cir.1978), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978).

court to more accurately make an informed decision and weigh the probative value of such evidence against the risks of prejudice specified in Rule 403. This requirement is an attempt to ensure that a decision to admit or exclude be made only after issues and reasons are exposed and clearly stated. *See id.* at 1317 n. 5. In addition, specific and clear reasoning and findings in the trial record will greatly aid an appellate court in its review of these evidentiary issues.

Before trial, Kendall sought discovery of evidence of other crimes, wrongs, or bad acts which the Government intended to present as evidence at trial. The trial court denied Kendall's request that the Government be ordered to produce such evidence before trial. The court, however, did enter a pretrial order prohibiting the Government from offering such evidence without prior court approval. The order stated, in pertinent part:

"The evidence here in dispute is governed by the provisions of Rule 404, Federal Rules of Evidence. While the government states that it does not know whether it will use such evidence, it is clear that the potential for prejudice by the improper admission of such evidence is sufficient to require the Court to carefully consider the reasons for which the evidence would be offered.

Accordingly, counsel for the government is prohibited from offering any evidence of prior or subsequent crimes, wrongs or bad acts, not charged in the indictment, without first informing the Court and counsel for the defense of the specific evidence to be offered so that the Court may consider the arguments of counsel, outside the presence of the jury, regarding the admissibility of said evidence."

Rec., vol. II, at 356.

Kendall claims the first error occurred when, in direct contravention of the pretrial order, the Government elicited testimony concerning an earlier sale by Kendall of an airplane subsequently used in drug smuggling. On direct examination, Geittmann was asked about his involvement in a prior marijuana smuggling venture that resulted in his conviction in 1975. When asked the identity of the pilot and the source of the airplane used in that venture, Geittmann responded that he had financed the purchase through the pilot, and that the pilot had purchased the airplane from Kendall. Defense counsel promptly objected and moved for a mistrial. This motion was denied, but the trial court admonished the Government and, at the request of defense counsel, instructed the jury to disregard the testimony. The court agreed that the Government had violated the pretrial order, but concluded that the violation was an oversight that under the circumstances did not require a mistrial. Any potential prejudicial effect was minimized by the court's proper and timely admonition that the jurors disregard the testimony. There is no evidence that the Government's actions were more than an oversight and Kendall does not allege that the Government acted in bad faith. Reviewing the record as a whole, we conclude that the trial court correctly refused to declare a mistrial.

Kendall next argues that the court erred in admitting evidence of prior airplane sales by Kendall to Geittmann. Later in Geittmann's direct examination, after the Government complied with the pretrial order, Geittmann testified about two aircraft that he purchased from Kendall in 1982. Over defense objection, he testified that during the sale of the first aircraft, Kendall showed Geittmann that the aircraft had been "plumbed" to accommodate extra fuel, and that Kendall had personally demonstrated the plane and this special fuel feature to him. Finally, he testified that two weeks after this first sale he traded in the plane for a second identical model because "[it] was a little better outfitted ... it had 350 gallons of fuel built into it which would enable me to go just about anyplace I wanted to go in Central, South America." Rec., vol. X, at 584.

Kendall argues that this is not Rule 404(b) evidence. At trial, the Govern-

ment contended that the evidence of these sales and the manner in which the special fuel system was presented by Kendall was relevant to show that Kendall had dealt with Geittmann before meeting Callihan; that Kendall knew Geittmann and the nature of his business; and that the plane had been prepared and could be used for smuggling purposes. The trial court concluded that these reasons justified admission of the evidence under Rule 404(b). We agree that the evidence is within the scope of Rule 404(b) and that the Government made a sufficient showing of the purpose for, and inferences to be drawn from, the evidence. The sales were close in time to Kendall's introduction of Callihan to Geittmann, and the testimony concerning the two sales had real probative value. The evidence is relevant to whether Kendall knew of Geittmann's activities and needs, from which a jury could infer the critical element of Kendall's intent and knowledge in introducing Callihan to Geittmann. It thus meets the requirements for Rule 404(b) evidence set forth in *Nolan.* In addition, the Government's explanation and the trial court's findings in the record were sufficiently explicit and clear within the meaning of *Biswell.* The trial court did not err in admitting this evidence.

Kendall next argues that the court erred in admitting evidence of Kendall's request that Geittmann check the status of Callihan's plane in Mexico. Over defense counsel's objection, Geittmann testified that in July or August 1982, Kendall asked him to check the airplane's tail registration numbers in Mexico. Geittmann stated that "[h]e told me the aircraft had been fired upon on one of the beaches south of Mazatlan. They were down there to pick up some marijuana. And he wanted to know if the plane was hot, if the Mexican police had gotten the numbers off the tail and if they were looking for it." Rec., vol. X, at 606. The Government complied with the pretrial order and offered its reasons for admission prior to the testimony. The Government claimed that "it shows knowledge, aiding and assisting by Mr. Kendall of Mr. Callihan in this particular venture,

and that if this plane was hot, then it could not fly into Cancun for this particular venture". Rec., vol. X, at 603. The trial court agreed that the evidence was within Rule 404(b), and while acknowledging that the evidence might be damaging to Kendall, nevertheless found that it was not sufficiently prejudicial to require exclusion. The court also gave an appropriate limiting instruction to the jury.

On appeal, Kendall argues that this evidence did not meet the Rule 404(b) foundation requirements and that any probative value was outweighed by the risk of substantial prejudice. We disagree. The conversation took place shortly before Kendall introduced Callihan to Geittmann. The evidence is relevant to prove that Kendall knew about Callihan's and Carr's smuggling activities and plans; that Kendall aided and assisted them in preparing for and furthering these plans; that Kendall knew how they were using their airplane; and that Kendall knew of both Geittmann's influence in Mexico and his involvement in smuggling activities. This proof is relevant to the issue of Kendall's knowledge of, and participation in, the conspiracies charged. The evidence meets the requirements of *Nolan.* The Government's explanation and the trial court's findings and actions were sufficiently explicit and clear to comply with *Biswell.*

Kendall next claims that error occurred when the Government asked Geittmann about a conversation with Kendall concerning an aircraft that Kendall owned and that had been seized in Mexico. Kendall argues that this evidence of prior acts is impermissible character evidence, does not fall within Rule 404(b), and was substantially prejudicial. We are not persuaded. Earlier, on direct examination, Geittmann had testified about a prior business relationship with Kendall, in which Geittmann had assisted Kendall in trying to recover a C–46 aircraft from Mexico. This testimony occurred at a point in the trial when the prosecution was attempting to establish the extent of prior dealings be-

tween Kendall and Geittmann. In describing his efforts to free the plane, Geittmann stated, "I'm sure it's still down there where it had been seized or where it had been taken to after it was seized." Rec., vol. X, at 607. Defense counsel did not object to this testimony.

On redirect examination, Geittmann elaborated on the details of this seizure, and testified that Kendall told him the plane had been seized because it was carrying contraband electronics from the United States to Mexico. Although Kendall now challenges this testimony, he did not object at trial. Furthermore, Kendall's defense counsel, on recross-examination of Geittmann, persisted in discussing and explaining the events surrounding the seizure, stressing that the activities, while illegal in Mexico, were not illegal in the United States. Later, on direct examination, Kendall himself testified that the plane had violated Mexican law and had been confiscated, and that he tried to use Geittmann to recover it. On cross-examination of Kendall, the Government, over objection, attempted to inquire further into the events surrounding the aircraft's seizure. Kendall admitted that he knew that the aircraft was being used for illegal purposes, that he and Geittmann had attempted to recover the plane by bribing certain officials, and that he had relied on Geittmann to make the bribe payments.

Kendall's own testimony about the seizure on direct and cross-examination does not pose a Rule 404(b) problem. Through his counsel, Kendall raised the issue of his own knowledge of, and participation in, the events surrounding the contraband seizure of the plane. Having thus raised this issue, he cannot complain now about the Government's cross-examination in this area.

The question is whether Geittmann's direct examination testimony concerning these events is admissible under Rule 404(b). The trial court concluded that this evidence qualified under Rule 404(b) as relevant to show Kendall's motive and lack of mistake or accident. The events surrounding the aircraft seizure occurred shortly before Kendall introduced Callihan to Geittmann. This evidence showed that Kendall, faced with the loss of a plane for carrying contraband, chose to enlist the aid of Geittmann. There was evidence introduced to show Geittmann's influential contacts with certain Mexican officials and his ability to engage in illicit activities in Mexico. This ability and influence was crucial to Geittmann's success as a drug smuggler. The extent to which Kendall knew of and relied on Geittmann's illicit influence is relevant to the issues of Kendall's knowledge of Geittmann's activities, Kendall's motives for dealing with and later assisting Geittmann, and the lack of mistake or accident by Kendall when he introduced Callihan to Geittmann. As we stated earlier, these issues were central to the conspiracy charges against Kendall. The requirements of *Nolan* and *Biswell* were met.

There was also no abuse of discretion when the trial court concluded that the evidence was not so prejudicial as to bar its admission under Rule 403. While Geittmann's testimony was certainly damaging to Kendall, its probative value sufficiently outweighed any potential prejudicial impact. Kendall's defense counsel chose to pursue the inquiry and focus attention on the seizure while examining both Geittmann and Kendall, and Kendall was acquitted on the charge of conspiring to import marijuana. We are not persuaded that Geittmann's initial testimony was so prejudicial that its admission constitutes reversible error. The evidence was properly admitted.

■ Finally, Kendall claims that the prosecution committed reversible error in its closing argument when it referred to the aircraft seizure in Mexico as being related to "smuggling." Rec., vol. XII, at 955. The trial court overruled defense counsel's objection that the term "smuggling" had no foundation in the record. On appeal, Kendall argues that this comment caused incurable damage and was highly prejudicial. We disagree. While Geittmann and Kendall never used the term

"smuggling" when describing the aircraft seizure in Mexico, there was ample testimony by both that the plane was carrying contraband into Mexico illegally. The prosecution's use of the term "smuggling" was thus based on a sufficient evidentiary foundation in the record. *See United States v. Perez,* 493 F.2d 1339, 1343 (10th Cir.1974); *cf. Marks v. United States,* 260 F.2d 377, 383 (10th Cir.1958), *cert. denied,* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959).

▉ Moreover, not all improper comments require a new trial or reversal on appeal. It is only when a remark could have influenced the jury's verdict and the trial court failed to take appropriate steps to remove it from the jury's consideration that there is reversible error. *Devine v. United States,* 403 F.2d 93, 96 (10th Cir. 1968), *cert. denied,* 394 U.S. 1003, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969); *Marks,* 260 F.2d at 383. Here, it is by no means apparent that this single remark could have influenced the jury's verdict. As we noted earlier, Geittmann and Kendall testified extensively and in great detail to the aircraft seizure and its carrying of contraband. This testimony was properly admitted. In addition, the use of the word "smuggling" would be much more likely to have an impact, if at all, on the jury's deliberations concerning the charge of conspiracy to *import* marijuana, a charge of which Kendall was acquitted.

### V.

#### Pretrial Disclosure

Kendall also claims that the Government's refusal to disclose its Rule 404(b) evidence before trial violated his Fifth Amendment right to due process and his Sixth Amendment right of confrontation and cross-examination. He argues that (1) given the risk of unfairness inherent in Rule 404(b) evidence, due process requires that a defendant be given pretrial notice of such evidence the Government intends to use, and (2) without such notice, a defendant cannot adequately prepare his case and is effectively prevented from meaningful confrontation and cross-examination at trial.

▉ "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977); *See Chaney v. Brown,* 730 F.2d 1334, 1339 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984). The Government is generally not required to disclose its witnesses or their testimony before trial. *See Weatherford,* 429 U.S. at 559, 97 S.Ct. at 846; *United States v. Rosales,* 680 F.2d 1304, 1305 (10th Cir.1981); *United States v. Pennick,* 500 F.2d 184, 186 (10th Cir.), *cert. denied,* 419 U.S. 1051, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974); *United States v. Baca,* 494 F.2d 424, 427 (10th Cir.1974). The one significant exception to this rule is exculpatory evidence; the government's failure to disclose such evidence before trial is a violation of due process. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Chaney,* 730 F.2d at 1339–40. The Supreme Court has made it clear, however, that *Brady* does not extend beyond such exculpatory evidence. *Weatherford,* 429 U.S. at 559, 97 S.Ct. at 845. *Cf., United States v. Flores,* 540 F.2d 432, 438 (9th Cir.1976) (*Brady* does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure). Because the evidence of which Kendall complains was not exculpatory or discoverable under the Federal Rules of Criminal Procedure, the Government's failure to disclose its 404(b) evidence does not violate due process.[6] Kendall cites no authority, nor

---

6. In support of his argument that due process requires pretrial disclosure, Kendall relies on several state court decisions, including a decision of the Oklahoma Court of Criminal Appeals in *Burks v. State,* 594 P.2d 771 (Okla.Cr.1979). The court in *Burks* held that pretrial disclosure of Rule 404(b) evidence was required. While the decision is arguably based on due process grounds, the court was also exercising its authority to interpret the relevant state statute in aid of its appellate jurisdiction. *Id.* at 776. We therefore decline to adopt the holding of the *Burks* decision.

have we been able to discover any, for the proposition that pretrial disclosure of Rule 404(b) evidence is required by the Sixth Amendment. Given the clear language of *Weatherford,* 429 U.S. at 559, 97 S.Ct. at 846, we conclude that there is no general Sixth Amendment right to such pretrial disclosure.

■ Kendall also argues that even if pretrial discovery of Rule 404(b) evidence is not constitutionally required, the lack of such disclosure in his case so impaired his ability to confront and cross-examine witnesses, and resulted in such unfairness and prejudice, that reversal is required. We are not persuaded.

To begin with, Kendall has made no showing whatsoever of how his right to a fair trial or ability to confront and cross-examine witnesses was adversely affected by the lack of pretrial disclosure. His vague and broad claim of unfairness and prejudice is not supported by any showing of how pretrial disclosure of Rule 404(b) evidence could have influenced the conduct of the trial. Furthermore, the current limitations on the use of Rule 404(b) evidence afford a defendant sufficient protection against unfair and unduly prejudicial effect. *See Nolan,* 551 F.2d at 271; *Biswell,* 700 F.2d at 1317–18. These requirements were fully met by the Government in this case, and all such evidence was properly admitted. Finally, the pretrial order, prohibiting the Government's use of 404(b) evidence without prior court approval, provided Kendall with substantial additional protection against the risks inherent in the use of 404(b) evidence.

■ This case does not fall within that line of decisions where a defendant is found to have been unduly prejudiced by the use of surprise evidence. *See, e.g., United States v. Tamura,* 694 F.2d 591, 599 (9th Cir.1982); *United States v. Baum,* 482 F.2d 1325, 1331–32 (2d Cir.1973). As these decisions recognize, a defendant confronted with such surprise evidence at trial must be afforded a fair opportunity to meet it and to adjust his trial strategy if necessary. If a defendant is not given this

opportunity, such as a grant of a continuance, then the resulting unfairness may require reversal. In Kendall's case, however, no objection was made, on the basis of surprise, to the introduction of any of the Government's Rule 404(b) evidence. At no time did defense counsel request a continuance, nor does the record show that defense counsel was unable to respond to the evidence or the reasons offered for its admission. The Government's refusal to provide its 404(b) evidence before trial was not reversible error.

AFFIRMED.