Margaret ORJIAS; Arthur O. Orjias; John M. Orjias; Arthur G. Orjias; Sandra L. Orjias; Stephen H. Pridy, individually and a next best friend of his minor children; Michael S. Pridy; Katherine M. Pridy; Jamie L. Pridy; Janmarie R. Pridy; Ethel I. Hines; Wendell P. Hines, Plaintiffs–Appellees,

v.

Martha STEVENSON, Plaintiff,

v.

LOUISIANA–PACIFIC CORPORATION, a Delaware corporation, Defendant–Appellant.

No. 93–1144.

United States Court of Appeals, Tenth Circuit.

Aug. 1, 1994.

998

Keith R. Clifford (Allen D. Reuter of Clifford & Reuter, Madison, Wisconsin, and Stanley L. Garnett and Andrew W. Loewi of Brownstein, Hyatt, Farber & Strickland, P.C., Denver, CO, with him on the briefs) of Clifford & Reuter, Madison, WI, for appellant.

Kevin S. Hannon (Wesley A. Light, Crested Butte, Colorado, Stephen H. Cook, Boulder, CO, and Joshua B. Epel, Denver, CO, with him on the brief), Denver, CO, for appellee.

Before KELLY and BARRETT, Circuit Judges, and O'CONNOR,[*] District Judge.

BARRETT, Senior Circuit Judge.

Appellant/defendant, Louisiana–Pacific Corporation (L–P), appeals from the district court's judgment following a jury trial on the issues of negligence per se and common law nuisance. The appellees/plaintiffs were awarded actual and punitive damages.

### Factual Background

In September, 1984, following the invitation of state and local officials, L–P located and began operating a waferboard plant near Olathe, Colorado. Waferboard is a building product which is manufactured by pressing wood chips and gluing resin together. The process of manufacturing waferboard produces air emissions of particulates and waste chemicals from at least four sources.

First, wet bark and sawdust are burned in a furnace, called a Konus Thermal Oil Heater, to generate most of the heat required by the plant. The stack emissions from the heater include carbon monoxide, particulates of ash and soot, resinous materials, formaldehyde, and volatile organic compounds (VOCs) which condense into a dust-like particulate as the emission contacts cooler outside air.

Second, wood, which has been chipped into wafers, is dried in a wafer drier. The drying process produces stack emissions which are similar to those from the Konus heater.

Third, the dried wafers are compressed with glue-like resins at high temperature to make the final waferboard product. Initially, L–P used a formaldehyde-based resin and later switched to a resin called "MDI." The heat and pressure from the press process releases natural resins from the wood and results in a stack emission containing steam and VOCs from the natural and added resins.

Fourth, piles of waste wood ash which are dumped on the ground can be blown into the air during windy conditions and are sources of particulate emissions.

Each source of emissions is regulated by the State of Colorado for health and safety reasons, with emission limits and conditions set in the regulatory permits. The permits set, inter alia, a visible emission or "opacity" limitation not to exceed 20%, Aplt.App., Vol. 2 at 199, and specific pollutant limitations measured in pounds per hour. Id., Vol. 6 at 1029.

Various pollution control devices or methods were implemented by L–P which, ideally, would enable L–P to meet the emissions limitations in the permits. For example, emissions from the Konus heater were blown through a cyclone and then through a fabric "bag house" to remove solid material and particulates. Emissions from the wafer dryer were passed through a series of cyclones and a bag house. Since 1985, emissions from the wafer dryer had also passed through an Electrified Filter Bed device (EFB) to remove additional particulates. To

---

[*] The Honorable Earl E. O'Connor, Senior Judge, United States District Court for the District of Kansas, sitting by designation.

decrease opacity from VOCs from the wafer dryer, heat going into the dryer was kept below a certain temperature. Blowing ash emissions were controlled by rain or by spraying water over the ash piles to form a crust.

Under normal operating conditions, state officials expected that all of the pollution control devices would work to keep L–P in compliance with the permits. It was expected that, occasionally, events would occur which were unforeseen and outside of L–P's control to prevent. Any valid "upset" conditions allowed L–P's emissions to exceed the permit limits for the short period of time that was required to repair the faulty equipment or process and was not a violation of the state regulations. If no upset condition was reported, any emission in excess of the permit limit was a violation of the state regulations.

The twelve plaintiffs are members of four families who had lived near the L–P plant when it began its operation. Margaret and Arthur O. Orjias, owned 55 acres east of the L–P plant on the other side of a highway. They built a house and improved the land to accommodate four mobile homes, two of which were rental units. Their teenaged son, John, lived with them. Their son and daughter-in-law, Arthur G. and Sandy Orjias, lived in a mobile home on the property. Ethel and Wendell Hines moved their mobile home onto the Orjias property, paying rent and making improvements to the land. The Pridy family resided on and farmed the land directly west of the L–P plant.

Within three years of the L–P plant opening, the plaintiffs had brought this suit and vacated their homes because of the noise, light, and irritating emissions which coated their homes and possessions with layers of grit and caused them physical illness, annoyance, inconvenience, and discomfort. During the approximately twelve-day jury trial, extensive documentary evidence and expert and lay witness testimony was presented to the jury. The jury awarded appellees $396,100 in actual damages and $1,872,000 in punitive damages. Though each plaintiff received differing amounts of actual damages, ranging from $10,000 for each of the three

Pridy children to $98,320 for Arthur O. Orjias, each plaintiff received $156,000 in punitive damages. The district court denied L–P's post trial motions for a new trial, judgment notwithstanding the verdict, and remittitur.

On appeal, L–P states the issues as (1) whether the trial court erred by admitting evidence of alleged environmental violations at a different L–P plant in another state; (2) whether the trial court erred in excluding testimony that plaintiffs' key witness, Scott Butler, was terminated from his employment with L–P for precisely the improper conduct he claimed was encouraged by L–P; (3) whether the trial court erred by not declaring a mistrial when a Colorado air pollution enforcement official falsely testified that "it had not cost L–P any money to violate the air quality standards" and by prohibiting L–P from conducting any cross examination on this issue; (4) whether the trial court erred in not assigning collateral estoppel effect to *United States v. Louisiana–Pacific Corp.*, 682 F.Supp. 1141 (D.Colo.1988), and in otherwise not permitting L–P to reference that decision; and (5) whether the trial court erred in submitting the issue of punitive damages to the jury or alternatively in refusing to remit the punitive damages award in accordance with Colorado law.

I.

L–P contends that because documentation of six air quality violations at an L–P waferboard plant in Wisconsin was improperly admitted under Fed.R.Evid. 404(b), L–P was tried for these prior bad acts and not for its own conduct in Olathe.

■ Decisions on evidentiary matters lie within the sound discretion of the district court and will not be disturbed absent a clear showing of abuse of discretion. *United States v. Morgan*, 936 F.2d 1561, 1571 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992).

Rule 404(b) provides, in part:

**Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ....

Fed.R.Evid. 404(b) applies to civil, as well as criminal cases. *Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). In *Huddleston,* a unanimous United States Supreme Court, recognizing a trend toward the improper exclusion of Rule 404(b) evidence, examined the legislative history of Rule 404(b) and concluded that "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." *Id.* at 688–89, 108 S.Ct. at 1500–01.

■ *Huddleston,* decided that protection against unfair prejudice can be afforded by four requirements to the admission of Rule 404(b) evidence: (1) the evidence must be offered for a proper purpose; (2) the evidence must meet the relevancy requirement of Rule 402, as enforced through Rule 104(b); (3) the trial court must assess whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *Id.* at 691–92, 108 S.Ct. at 1502; *United States v. Record,* 873 F.2d 1363, 1374 (10th Cir.1989); *Turley v. State Farm Mut. Auto. Ins. Co.,* 944 F.2d 669, 675 (10th Cir. 1991).

■ We understand L–P's argument to be that the first two *Huddleston* requirements are not met here. L–P argues that because it is uncontroverted that L–P had knowledge of its emissions and because there is no evidence that L–P concealed or misrepresented the contents of its emissions, the Wisconsin letters were irrelevant and were not offered for a proper purpose.

Assuming that L–P is correct that the contents of the emissions were undisputed, still the Wisconsin letters were relevant to the issue of whether L–P was liable for will-

ful misconduct or negligence in bringing this plant to Colorado if it had notice or knowledge that it could not comply with the Colorado air quality regulations with its existing technology.

Responding to L–P's motion in limine to exclude any evidence regarding the Wisconsin violations, the district court stated, "Now, the Wisconsin plant, I can see an argument for punitive damages because [plaintiffs are] claiming that the defendant knew about— something about the technology based on the Wisconsin plant and didn't reveal it in [Colorado] or didn't utilize it in [Colorado]." (Aplt.App., Vol. 6 at 1101.)

At trial, Plaintiffs' Counsel asked Mr. Klafka of the Wisconsin Department of Natural Resources these foundational questions for each of the six Wisconsin letters:

> Plaintiffs' Counsel: Mr. Klafka, just briefly describe for the jury with respect to the wafer dryer process, what emissions violations was Louisiana–Pacific notified of in this document?

\* \* \* \* \* \*

> Plaintiffs' Counsel: And does this letter contain information that was provided to Louisiana–Pacific regarding emissions from the wafer dryer process, or excess emissions from the wafer dryer process in Wisconsin?

\* \* \* \* \* \*

> Plaintiffs' Counsel: With respect to the wafer dryer process, Mr. Klafka, would you just summarize for the jury what information is contained in this letter with respect to the wafer dryer process exceeding emission standards?

\* \* \* \* \* \*

> Plaintiffs' Counsel: And does this document contain information regarding notification to Mr. Dilworth at Louisiana–Pacific regarding opacity violations in excess of 20 per cent from the wafer dryer process?

\* \* \* \* \* \*

> Plaintiffs' Counsel: Briefly describe for the jury, Mr. Klafka, the information con-

tained in Exhibit 32 with respect to excess emissions from the wafer dryer process.

\* \* \* \* \* \*

Plaintiffs' Counsel: And does this letter contain information or notice to Mr. Dilworth of Louisiana–Pacific regarding excess emissions from the waferboard process in Hayward [Wisconsin]?

(Aplt.App., Vol. 4 at 629–33.)

In the Order Concerning All Post–Trial Motions, the district court stated:

All of the evidence in question was received pursuant to Fed.R.Evid. 404(b) on the issue of whether Louisiana Pacific had knowledge or notice concerning what sorts of things are emitted as by-products of the waferboard manufacturing process. Knowledge or notice of these matters was relevant to the question of whether Louisiana Pacific was negligent in designing and operating the Olathe waferboard facility and whether its operation of the facility constituted an unreasonable use of its property. It was also relevant to the question of whether Louisiana Pacific concealed certain facts from the Colorado regulators or misrepresented certain facts to the Colorado regulators. Such misrepresentations or omissions were relevant to the question of whether plaintiffs' punitive damages claim could be premised on an allegation that Louisiana Pacific's conduct at Olathe was attended by circumstances of fraud or willful conduct.

(Aplt.App., Vol. 1 at 52.)

L–P's closing argument urged the jury to give the Wisconsin letters little weight:

The [Notices of Violation] from Wisconsin, remember the talk about how you were limited, Judge Nottingham limited you, instructed you could only consider that as to what L–P knew when they came out here to see whether they'd know that we couldn't comply with Colorado standards. In fact, you heard Mr. Cavadeas testify that the Hayward plant was three times the size of this plant out here. And so they believed, regardless of their experience in Wisconsin, that they wouldn't have those problems here in Colorado.

And beyond that, Mr. Reynolds said one of the things you've got to consider is source reduction. Do you remember that phrase? That's exactly what Louisiana–Pacific did when it built a smaller plant here than the one in Hayward. It was reducing the potential emissions from a source.

(Aplt.App., Vol. 7 at 1336.)

We hold that the first two *Huddleston* requirements are met here because the evidence was relevant and was offered for a proper purpose. The evidence was properly offered to show L–P's prior knowledge and notice of the emissions, both content and quantity, that would result from the operation in Olathe.

Because L–P does not challenge the third and fourth *Huddleston* requirements, we may briefly mention them. *Huddleston* requires the trial court to assess whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403. Under Rule 403, some prejudice is allowed. However, the prejudice cannot substantially outweigh the probative value.

During trial, the district court performed a balancing test with respect to this evidence when it stated, "I find that the evidence is admissible under Rule 403, and that the probative value is outweighed by—I'm sorry—that the probative value is not outweighed by any possible prejudice." (Aplt.App., Vol. 4 at 638.) The district court found that any possible prejudice failed to outweigh, let alone substantially outweigh, the probative value. Therefore, we hold that the third *Huddleston* requirement is met.

Lastly, *Huddleston* directs the trial court to, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. Here, following the admission of the letters in evidence, the court, sua sponte, instructed the jury:

THE COURT: Members of the jury, I'm going to talk to you about these exhibits for a moment and instruct you about these exhibits.

What happened back in Wisconsin is really not relevant to what happened in [Olathe], and Louisiana–Pacific is not on trial here for anything that happened back in Wisconsin. Therefore, you should not utilize these exhibits for the purpose of— substantive purpose of establishing that there was a violation in Wisconsin so there must have been a violation in [Olathe].

These exhibits are received for a limited purpose, and that limited purpose is to show that the defendant, Louisiana–Pacific, had knowledge of the matters that are asserted in the letters. That's the only purpose for which these materials are received. You should consider it for that limited purpose and for no other purpose.

(Aplt.App., Vol. 4 at 633–34.)

We hold that the fourth *Huddleston* requirement was met. The district court, even though L–P did not request the limiting instruction, went beyond the requirements of *Huddleston* in giving a sufficient limiting instruction.

Appellant further argues that we should apply to this case the stringent requirements of *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). In *Kendall*, we decided that the proponent of the evidence "must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts." We also indicated, in *Kendall*, that the "trial court must specifically identify the purpose for which such evidence is offered and a broad statement merely invoking or restating Rule 404(b) will not suffice." *Id.*

After the *Huddleston* case was decided, however, we revisited the Rule 404(b) issue. In *United States v. Orr*, 864 F.2d 1505, 1511 (10th Cir.1988), we held that any failure to adhere to the *Kendall* requirements would be considered harmless if "the purpose for admitting the other acts testimony is apparent from the record, and the district court's decision to admit was correct." Here, because the record demonstrates that the district court's decision to admit was proper under *Huddleston*, any failure to meet the *Kendall* requirements was harmless. *See Record*, 873 F.2d at 1375 n. 7.

## II.

L–P contends that the trial court abused its discretion in excluding testimony that would tend to prove that plaintiffs' key witness, Scott Butler (Butler), was terminated from his employment with L–P for precisely the improper conduct he claimed was encouraged by L–P.

Butler was a shift supervisor at L–P from August, 1984, until June, 1986. (Aplt.App., Vol. 2 at 297.) His crew ran the entire plant for an eight hour rotating shift. *Id.* at 298. At trial, Butler testified that in order to meet the opacity air standard of the wafer-dryer stack, the inlet temperature into the wafer dryer could not exceed 1,000°. *Id.* at 308. He also testified that his superiors required him to meet a certain level of production of waferboard during his shift, with the understanding that he would be fired if production was not met. *Id.* at 309–10. However, Butler testified, it was impossible to dry enough wafers to meet the required level of production unless the inlet temperature was maintained between 1,100° and 1,500°. *Id.* at 325. Butler called it a Catch–22 situation with production winning out over pollution control. *Id.* at 309–10.

Butler testified that: frequently, L–P had no restrictions on the inlet temperature, *id.* at 311; occasionally, L–P would instruct its dryer operators to stay within the inlet temperature, *id.* at 310–11; but at those times, because there was no reciprocal easing up of production levels, the dryer operator, with management's knowledge, *id.* at 320–21, would use various methods to conceal or explain high dryer inlet temperatures; the dryer operator could falsify the graph readout on which the inlet temperatures were recorded; and this would be accomplished by controlling the pen on the graph with a finger, putting paper between the pen and the graph so that it would appear that the pen ran out of ink, or substituting the graph with a previous graph which showed the proper temperature, *id.* at 311–12; the dryer operator would manually increase the inlet temperature or would increase the fuel into the

wafer dryer but would later claim that the automated equipment which controlled the inlet temperature was defective, causing the high temperature, *id.* at 314–15; a fully operable temperature controller would also be removed on the pretext that it needed repairs; and a new controller would then be inserted and adjusted to conceal the inlet temperature. *Id.* at 315–16.

Butler also testified that the production of the plant would be higher at night to make up for any decrease in production during the day, *id.* at 324; the increased nighttime production required higher inlet temperatures, *id.* at 325; and the higher inlet temperatures, in turn, resulted in higher opacity which could not be detected at night. *Id.* at 325–26. Butler stated that at one of the production meetings with management, the shift supervisors were told to change the focus of the outdoor lights away from the stack to hide the nighttime opacity levels. *Id.* at 328.

On cross-examination, Butler admitted, inter alia, that the falsification and other practices to allow high temperature operation of the wafer dryer were committed by the people he was supervising with his knowledge and consent. *Id.* at 338–39. Butler recalled a conversation that he had with Juan Maestas (Maestas), a subordinate of his. In the conversation, Maestas told Butler that allowing the crew to violate the rules of operation could cause Butler a problem and that Butler could lose his job. Butler then admitted that he had been discharged from the company in June, 1987. This colloquy followed:

> Defendant's Counsel: And did some of the reasons or any of the reasons relating to your discharge have to do with your failure to require your dryer operators to comply with the rules?
>
> Butler: No, sir.
>
> Defendant's Counsel: You deny that? You do deny that?
>
> Butler: Louisiana–Pacific never gave me a reason for discharging me. I asked for a copy of my records and I didn't ever get any copy of my records, so I don't know.
>
> \* \* \* \* \* \*

*Id.* at 356.

Later at trial, L–P called Maestas as a witness. The pertinent portion of his direct testimony is as follows:

Defendant's Counsel: Now, in your position as personnel manager, do you also have involvement in termination of employees?

Maestas: Yes. I handle all the terminations.

Defendant's Counsel: And, do you know why Scott Butler was terminated?

Plaintiffs' Counsel: Objection, Your Honor. He was not the personnel manager when Mr. Butler was terminated. This calls for a hearsay response I suspect.

The Court: All right. Foundation will need to be established.

Defendant's Counsel: You bet. Mr. Maestas, when—first of all, when did you become personnel manager?

Maestas: Became personnel in July of 1988.

Defendant's Counsel: And, are there personnel file [sic] that are kept with regard to anybody that's ever worked at the plant?

\* \* \* \* \* \*

Maestas: Yes.

Defendant's Counsel: Okay. And, who's the custodian? Who keeps track of those personnel files?

Maestas: I do.

Defendant's Counsel: Okay. And, are those files kept for everybody that's ever worked at the plant?

Maestas: Yes, they are.

Defendant's Counsel: All right. And, have you reviewed the file with regard to Scott Butler?

Maestas: Yes, I have.

Defendant's Counsel: And, based off of that review, do you know why he was fired?

Plaintiffs' Counsel: I object, Your Honor; this—

The Court: Sustained.

Defendant's Counsel: Mr. Maestas, let me talk about just a couple more subjects. Have you ever had a problem with—

The Court: Ladies and gentlemen, let me interrupt at this point. You know, this is one of those instances where it appears that the lawyer is asserting that he knows something that the rest of us don't know. The state of the evidence in this case is that nobody knows why Mr. Butler was fired. That's the state of the evidence now. You shouldn't infer anything from the fact that there's been some sort of suggestion about personnel files because that is not competent evidence, and you should disregard that.

*Id.,* Vol. 4 at 776–78.

The district court ruled that Maestas's testimony was not competent evidence. Maestas did not have firsthand knowledge of the firing. L–P did not at any time offer Butler's personnel file in evidence; rather L–P simply offered Maestas's testimony about his recollection of the information in the file. This evidence was double hearsay. Because both levels of hearsay did not fall within an exception to the hearsay rule, Fed.R.Evid. 805, the district court properly excluded this testimony.

■ Later at trial, L–P made an offer of proof for Jay Byers's (Byers) rebuttal testimony:

Defendant's counsel: Mr. Byers will testify that [he's] the one that terminated Mr. Butler. He had the conversation with him. He told him why he was terminated. He was terminated specifically for violating L–P procedures with regard to managing his people on the wafer dryer. It's critical evidence. It's in rebuttal to what came out in the plaintiffs' case....

. . . . .

The Court: All right. Well, I've heard enough. I'm going to exclude that aspect of Mr. Byers' testimony for several reasons. The first reason is because in 1988—April 26, 1988, the plaintiffs propounded interrogatories asking Louisiana–Pacific to "indicate whether L–P disciplined, reprimanded, criticized, or demoted, dismissed, or took any other personnel actions with regard to any employee of L–P based on that person's involvement in limiting or failing to limit air emissions at

the Olathe Plant." That was Interrogatory # 36 on a date which is unclear from the answers. But, presumably, a short time later in 1988, you answered Interrogatory # 36 saying, no, that nobody had ever been disciplined with regard to that.

\* \* \* \* \* \*

The Court: And, thereafter, the plaintiffs did depose Mr. Byers. However, in light of your interrogatory answer, they could reasonably conclude that he had no testimony to give on the question of whether Mr. Butler was disciplined for his actions or inactions with respect to the wafer dryer.

The second basis for excluding this information is that again. And, in 1990, you were asked to detail what your witnesses would testify to and you endorsed Mr. Byers and I'm referring here to a document called Defendants' Responses to Plaintiffs' Interrogatories and Request for Production of Documents Regarding Non–Expert Witnesses which was dated April 18, 1990. Mr. Byers is endorsed and there is no mention of anything close to the testimony that you propose to have him give.

The third reason for not permitting it is that I don't think the testimony was all that important under Rule 403. Mr. Butler testified that he was discharged. That much has been established, that he was fired by Louisiana–Pacific. He testified that he was never given a copy of the reasons for the discharge. Now, that doesn't mean that he was not orally told the reason for the discharge, but he was never given a copy of the reasons for the discharge.

So, the rebuttal or impeachment value of this testimony is extremely limited and I think considerations of wasting time, plus the fact that you failed to respond to discovery, justifies exclusion of his testimony.

Defendant's Counsel: Your Honor,.... With regard to the interrogatory which was a question about pollution control equipment, ... the connection between the wafer dryer and pollution control equipment and failure to properly handle that is

tenuous, at best, and my indication was that he was terminated for failing to control his crew with regard to the wafer dryer, not with regard to pollution control equipment, not with regard to monitoring, handling, the EFB, and, frankly, Your Honor, I can tell you that's not the way that the L–P people saw it at the time. He failed to follow orders, failed to control his people....

*Id.*, Vol. 5 at 785–88.

█ With regard to Byers's testimony, the district court primarily excluded his testimony because L–P had twice failed to give adequate discovery responses about the content of his testimony. The imposition of sanctions for abuse of discovery under Fed. R.Civ.Pro. 37 is a matter within the discretion of the trial court. *Robinson v. Audi NSU Auto Union,* 739 F.2d 1481, 1483 (10th Cir.1984) (citing *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976)). Rule 37(c) provides:

(c) **Failure to Disclose: False or Misleading Disclosure; Refusal to Admit.**

(1) A party that without substantial justification fails to disclose information required by Rule 26(a) [for written interrogatories] or 26(e)(1) [for supplementation of disclosure and responses] shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

█ Notwithstanding Rule 37(c), the district court may be found to have abused its discretion if the exclusion of testimony results in fundamental unfairness in the trial of the case. *Smith v. Ford Motor Co.,* 626 F.2d 784, 794 (10th Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981).

L–P's response to interrogatory # 36, which asked whether any employee had been disciplined for limiting or failing to limit air emissions at the Olathe plant, was an unqualified "no." Though L–P argued that Butler was fired for failure to control his crew on the wafer dryer, not for failing to limit air emissions, this is neither a substantial justifi-

cation nor a harmless failure under Rule 37(c). Moreover, L–P failed to detail prior to trial those issues Byers would testify about. Therefore, the trial court did not abuse its discretion in excluding Byers's testimony.

Further, Butler's bias or prejudice was adequately shown to the jury. Butler acknowledged, on cross-examination, that he had knowledge of, and participated in, the acts of concealment which he described. He admitted that these practices were undertaken by people under his supervision. Butler acknowledged that Maestas, whom he supervised at the time and who later became personnel manager, warned him that allowing his crew to violate rules of operation could cause Butler to lose his job. Butler also admitted that he had been fired by L–P, although he was never notified of the reasons for his termination. Butler's conversation with Maestas was confirmed by Maestas. Thus, the jury had before it evidence that: Butler was a knowing participant in the fraud; the employees under his supervision were also knowing participants; Butler was on notice about possible termination for inadequate supervision; and, Butler was fired. Beyond the evidence already before the jury, Byers's testimony went to the issue of whether Byers had told Butler the reasons for his termination, a collateral issue.

We hold that the exclusion of Byers's testimony did not result in fundamental unfairness in the trial of the case and that the district court did not abuse its discretion in limiting the testimony of Maestas and Byers.

## III.

█ L–P argues that the trial court erred by not declaring a mistrial when a Colorado air pollution enforcement official falsely testified that "it had not cost L–P any money to violate the air quality standards" and by prohibiting L–P from conducting any cross examination on this issue.

█ We review for an abuse of discretion a district court's denial of a motion for a mistrial based on potentially prejudicial testimony. *Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 703 F.2d 1152, 1179 (10th Cir.1981), *cert. denied,* 464 U.S. 824, 104

S.Ct. 92, 78 L.Ed.2d 99 (1983) (citing *Standard Industries, Inc. v. Mobil Oil Corp.*, 475 F.2d 220, 228 (10th Cir.), *cert. denied*, 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973)). Mistrial is not justified if an affirmative direction to disregard is issued to the jury and it does not clearly appear that the challenged remarks influenced the verdict. *See Lambert v. Midwest City Mem. Hosp. Auth.*, 671 F.2d 372, 375 (10th Cir.1982); *Ward v. H.B. Zachry Const. Co.*, 570 F.2d 892, 895 (10th Cir.1978).

On the first day of trial, plaintiffs called Scott Miller (Miller), an engineer with the Colorado Department of Health, Air Pollution Control Division, to testify about the regulatory relationship between L–P and the State of Colorado. The relevant portion of his testimony follows:

Plaintiffs' Counsel: Mr. Miller, the reference on the first page of this letter is that it's called a "Official Notice of Violation." Do you see that?

Miller: That's correct.

Plaintiffs' Counsel: Up to this point in time, the letters from the Department of Health to Louisiana–Pacific on these types of issues had been called "Revocations of Permit." Is that correct?

Miller: That's correct.

Plaintiffs' Counsel: Why now in August of 1989 is the letter, this kind of notice being called a "notice of Violation" as opposed to a "Revocation of Permit" in previous years?

Miller: Since the last notice of revocation, Louisiana–Pacific did receive final permits. In other words, they did meet the letters or the conditions that were stipulated on those permits. Once that happens, they receive their final permit. A final permit cannot be revoked under state statutes, so they have it for the life of the operation. After a final permit is issued, if you find a violation of any of the air quality statutes, then you issue a notice of violation, set up a hearing with the company to hear their side of the story, and then issue a compliance order. This is the initial letter starting that process.

Plaintiffs' Counsel: Given the history of revocations and your memos in prior years, can you explain for the jury what—your understanding of why a final permit was issued to L–P to kick over to this new procedure?

Miller: At sometime between 1986 and 1989, and I don't remember exactly when, we went through and documented that they had complied with each one of the conditions on the permit, so the permit was issued. It's a situation where to continue to revoke the permit would not suit the purposes of the State of Colorado. In a situation where you're trying to close a company in an area where jobs are at a premium, you tend to generate a lot of controversy. Notices of violation and compliance orders, on the other hand, are fines, they are not necessarily closing the plant. So it's a different course in the enforcement of the air pollution control regulations.

Plaintiffs' Counsel: Was there any calculated thinking on the part of the Department of Health, and specifically that you were aware of, that led to this new or this revised procedural approach?

Defendant's Counsel: Objection to the form. I think it calls for hearsay.

The Court: Sustained.

Plaintiffs' Counsel: I can lay a foundation.

Plaintiffs' Counsel: Were you a person who had input—

Miller: I'm the one that recommended the final approval.

Plaintiffs' Counsel: Just a minute. Were you a person who had input—

Miller: Yes.

Plaintiffs' Counsel: —into the decision to give final approval for the permits that led to this procedural change?

Miller: Yes. I recommended the final approval.

Plaintiffs' Counsel: What was the basis of that recommendation? What was going on in your head when you did that?

Miller: Basically what I just said. It's one of those that after three years of stirring up the controversy over jobs versus environment, they documented or demonstrated that at least on a short-term basis, they

could comply with the standards. So I recommended issuance of the final permit.

Plaintiffs' Counsel: Was there any other motivation to that recommendation in terms of your thinking? Did you think it was going to give you any new options or new approach or new—

Miller: Well, you know, it's—

Defendant's Counsel: Objection, leading.

The Court: Overruled.

Plaintiffs' Counsel: Was there any other aspect to your thinking behind making that recommendation?

Miller: If you look at the amount of time and effort and money that the State of Colorado has invested in Louisiana–Pacific up through this time, August 17th of '89, we have not collected one penny in fines, and it has not cost Louisiana–Pacific any money to violate the air quality standards.

Defendant's Counsel: Objection—

The Court: Sustained.

(Aplt.App., Vol. 2 at 226–29.)

At that point, the district court excused the jury for the evening. *Id.* at 229. L–P promptly moved for a mistrial. The next day, after having taken the matter under advisement and hearing further arguments outside the presence of the jury, the district court denied the motion for a mistrial. Thereafter, the district court gave the following limiting instruction:

I needed to talk to you very briefly about what happened immediately before the recess last night. You may recall that the witness, Mr. Miller, said some—or made an offhand remark something to the effect of the fact that the Louisiana–Pacific hadn't paid any fines to the State of Colorado and you also observed, undoubtedly, that I was not at all happy with that remark. That remark tended to introduce a collateral issue into this case, the question of whether or not Louisiana–Pacific has been fined and, if so, how much it has been fined. This is not a case brought by the State of Colorado where we're litigating the fine nor is the fact that it has been fined or not fined an issue which is relevant to this case. We're here solely to determine whether this corporation is lia-

ble to these plaintiffs in damages. If we got off on debating the issue of a fine, it's a disputed question of fact and Louisiana–Pacific has its own position, it has its own version of events, and it would be entitled to bring that up. The plaintiffs would be entitled to get into it and you and I would be sitting here for hours or days listening to irrelevant material about whether or not Louisiana–Pacific has been fined by the State of Colorado.

For those reasons, I am ruling that that remark was improper and should be entirely disregarded by you. If you don't disregard or if you didn't disregard it, we would be spending even longer here than we're going to be spending listening to this. So, please, disregard that last remark that Mr. Miller made during his testimony yesterday.

*Id.* at 255–56.

Prior to Miller's testimony, L–P, in its opening statement, implied that its conduct had been proper because the State of Colorado had the power to revoke L–P's permit and shut down the plant's operations, but never did so. *Id.*, Vol. 7 at 1206. It was within this context that plaintiffs called Miller to testify about the regulatory relationship between L–P and the State of Colorado. The improper remark came as Miller was explaining that a final permit had been issued, in spite of L–P's previous violations, in part to allow the state to collect fines without repeatedly trying to revoke temporary permits.

Miller's last statement on the first day of trial did not deprive L–P of a fair trial. In light of the entire context of Miller's testimony, it is clear that he was describing the Colorado regulatory framework. We are convinced that the jury did not improperly focus on this isolated comment, and that the district court's curative instruction was adequate. The jury was instructed to disregard Miller's remark and was adequately informed of the reasons for disregarding it. Accordingly, we hold that the district court did not abuse its discretion in denying L–P's motion for a mistrial.

■ L–P also argues that it was reversible error for the district court to limit its

**1008**

cross-examination of Miller on the issue of whether L–P had paid fines to the State of Colorado.

 Trial courts retain broad discretion to impose reasonable limits on cross-examination based on concerns of harassment, prejudice, or confusion of the issues. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *United States v. Morgan*, 757 F.2d 1074, 1076 (10th Cir.1985). A matter is collateral if it could not have been introduced in evidence for any purpose other than for impeachment. *United States v. Walker*, 930 F.2d 789, 791 (10th Cir.1991).

In *Francis v. Clark Equipment Co.*, 993 F.2d 545 (6th Cir.1993), we affirmed the trial court's grant of the defendant's motion for a new trial. *Id.* at 552. In that case the plaintiff first presented significant evidence of strict liability under the risk-benefit standard. *Id.* at 549. Before the defense was allowed to cross-examine the witness, the plaintiff abandoned the risk-benefit standard. *Id.* Because the defense was prevented from presenting any evidence in rebuttal, the court later determined that, despite a limiting instruction, the defendant had been prejudiced, and it granted the motion for a new trial. *Id.* at 550–51.

Here, the plaintiffs' witness, rather than testifying extensively about fines, simply made one improper comment. Though we do not believe that the jury was likely to apply the comment out of context, the district court's curative instruction was an added guarantee that any jury focus on the issue of whether L–P had paid any fines was diverted.

L–P's attempt to raise the fines issue again on cross-examination was a collateral matter. Whether L–P paid any fines after August 17, 1989, was not relevant. Therefore the district court could properly exclude it under Fed.R.Evid. 403 as a collateral matter likely to lead to confusion of the issues.

From the record before us, we are satisfied that the district court did not abuse its discretion in either denying the motion for a mistrial or in limiting the scope of Miller's cross-examination.

## IV.

 L–P argues that the district court erred in not assigning collateral estoppel effect to *United States v. Louisiana–Pacific Corp.*, 682 F.Supp. 1141 (D.Colo.1988) (referred to by the parties as the Arraj decision), and in otherwise not permitting L–P to reference that decision.

In the Arraj decision, the Environmental Protection Agency (EPA) sued L–P under the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.* and its regulations alleging violations of its prevention of significant deterioration (PSD) permitting program.[1] *Id.* at 1144. The EPA sought the assessment of civil penalties and an injunction against further alleged violations at two L–P plants in Colorado, Olathe and Kremmling. *Id.* at 1145.

In that decision the district court made the limited determination that the specific March, 1985, test for carbon monoxide emitted from the Olathe Konus heater was improperly performed for purposes of determining whether a PSD permit was required. *Id.* at 1159. Thus, the claim against the Olathe plant was dismissed. *Id.*

The court determined that the Kremmling plant was in violation of the PSD regulations and imposed a civil penalty against L–P. *Id.* at 1166. In determining the amount of the penalty, the court considered both aggravating and mitigating factors. *Id.* at 1164–66. As a mitigating factor, the court considered the fact that L–P had installed EFBs in both of its Colorado plants. *Id.* at 1164. The court stated:

> I am aware that the determination of what controls constitute BACT for a particular source is an agency determination to be made by the EPA, and not by this court. However, the testimony of numerous ex-

**1.** The PSD program is designed to protect areas of the country where the air is relatively clean and to prevent the air quality in areas where it exceeds the statutory minimum from degenerating to that level. *Id.* at 1145. To achieve its goals, the PSD program required new sources of emissions to contain the best available control technology (BACT) to control air pollution. *Id.* at 1164.

perts at trial did establish the fact that the pollution control equipment "pioneered" by [L–P], and which was installed at Kremmling and Olathe at considerable expense, was the most effective control equipment for the particular application at issue that technology could provide. While this court cannot and does not hold that this equipment (EFB) was BACT, I can and do hold that, in light of the ultimate purpose of the PSD program, these actions taken by [L–P] mitigate against the imposition of a heavy penalty.

*Id.* (footnote omitted).

In that case, the district court also denied the EPA's request for an injunction, because the government had failed to establish that there existed some danger of recurrent violation, and further because an injunction from further violations of the Clean Air Act or state implemented plan would merely require L–P to "obey the law." *Id.* at 1167.

In the case before us, Miller testified that he had made estimates of air pollution emissions from the Olathe plant based on the March, 1985, stack tests. (Aplt.App., Vol. 2 at 202–03.) On voir dire, the district court prevented L–P from impeaching this witness by introducing evidence that the stack tests were ruled invalid by a federal court. *Id.* at 204. During this examination, the district court, addressing the Arraj decision, stated:

> All right. Let me try to clarify my ruling before the jury comes in concerning the use of Judge Arraj's decision in *United States v. Louisiana–Pacific Corporation.* That case was an action brought by the United States in the form of the Environmental Protection Agency against Louisiana–Pacific Corporation. That being the case, I can't think of any principle on which the plaintiffs in this case are collaterally estopped by the result in that case, or that the defendant is entitled to any res judicata effect from that case.
>
> Therefore, my ruling is that except for purposes of impeachment, Judge Arraj's decision and findings ought to be irrelevant in this case, because the only possible issue that they could be relevant on is the question of collateral estoppel. Moreover, it's highly prejudicial, I believe, to be tell-

ing this jury that a federal court in the form of a federal judge has already made findings of fact contrary to the position the plaintiffs want to take here. In effect, that's giving the defendant the advantage of a form of collateral estoppel that it's not entitled to.

> Now, as far as I'm concerned, you may use that decision in impeaching the testimony of witnesses; that is to say, if a witness relies on a finding that Judge Arraj rejected, you may say or ask the witness if he relied on that finding and if he was aware, in relying on that finding, that it had been rejected by a Court or by Judge Arraj or words to that effect. But beyond that, I don't think that it's proper to use that decision in this case.

*Id.* at 210–11.

Later in the trial, Mr. Reynolds, plaintiff's expert witness, testified that he had relied on the March, 1985, wafer dryer stack tests in reaching his conclusion that L–P had violated particulate emission levels. *Id.,* Vol. 3 at 505. Following an objection, the district court ruled that the invalidity of the March, 1985, tests was dictum in the Arraj decision and prevented L–P from introducing this evidence on cross-examination. *Id.* at 511.

After the jury was excused, the court stated:

> I want to address briefly, the conversation that we all had at the bench, the last one in which defense counsel was precluded from some cross-examination concerning Judge Arraj's finding regarding the accuracy of the March 1985 tests.
>
> I am not by that ruling, and I trust it was understood precluding examination into the underlying facts that Judge Arraj was talking about. I was only precluding the witness being asked, is he aware that a federal court has found those facts to be inaccurate or has found those findings to be inaccurate. And I distinguished that from a question such as, are you aware of the following facts, the facts underlying Judge Arraj's finding. So, I want to make that clarification.

*Id.,* Vol. 3 at 512–13.

The district court also precluded the plaintiffs from mentioning the Arraj decision

when it was reading the deposition of Daniel Dilworth, L–P's Director of Waferwood Operations, in evidence. The following side bar conference was held:

The Court: What on earth are you doing in the EPA case that I've kept them from mentioning?

Plaintiffs' Counsel: Your honor, I have an EPA deposition and he was cross examined on that document and I was just cross examining him on his credibility. He denies seeing it and I get to ask him—

The Court: Well, what do you think they're entitled to cross examine?

Plaintiffs' Counsel: It says EPA case. It could have been any EPA case.

The Court: Well, I don't care. They're entitled to bring up the result in the case that you have now opened up.

Plaintiffs' Counsel: I respectfully disagree, Your Honor. The question is worded EPA case. It doesn't say EPA case against—

The Court: I don't care. I don't care what it says. The fact is that you have brought up a quote and opened up the subject matter.

\* \* \* \* \* \*

Plaintiffs' Counsel: Your Honor, I would ask the Court to consider to what extent it has been opened up; that he was deposed in the EPA case, the outcome of the EPA case, what he said in the EPA case. I was impeaching this man's denial of prior testimony that he'd given that was inconsistent with the first question I asked him.

The Court: You can't have it both ways. If you're going to keep the EPA case out of this, then keep it out.

(Open Court.)

The Court: All right. Move on. Or else, if you do go into this any more, you're doing it under the admonition that I previously gave you.

Plaintiffs' Counsel: Into this document, at all, Your Honor?

The Court: That's right. Just so you're clear, I'm not prohibiting you from getting

into this. I told you at the bench what the consequences of getting into it are going to be.

Plaintiffs' Counsel: Then, I will skip to Page 408, Line 15.

*Id.,* Vol. 3 at 408–10.

L–P argues that the district court should have collaterally estopped the plaintiffs from introducing any evidence of the March, 1985, emissions tests as evidence of negligence *per se* because the Arraj decision had already decided that the tests were invalid.

■■■ Our standard for reviewing the availability of the collateral estoppel doctrine to bar issue relitigation is *de novo. Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 894 (10th Cir.1994).

■■■ We apply the federal law of collateral estoppel to this case because the issues sought to be either introduced or precluded stem from a prior federal court judgment. In *Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation,* 975 F.2d 683, 687 (10th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993), we held that collateral estoppel is available if: (1) the issue previously decided is identical with the one presented in the present action; (2) the prior action has been a final adjudication on the merits; (3) the party against whom the collateral estoppel doctrine is invoked was a party or in privity with a party in the prior action, and (4) the party against whom the collateral estoppel doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Here, because the identical issue was not previously decided, we need not decide whether the other elements of collateral estoppel are met.[2] The Arraj decision dealt with the narrow issue of whether L–P's Olathe plant had the potential to emit 250 tons per year of carbon monoxide and therefore was required to have a PSD permit. *Louisiana–Pacific Corp.,* 682 F.Supp. at 1155. For purposes of calculating the 250 tons, the court decided that the March, 1985, stack tests were invalid with respect to the

---

2. L–P argues that the district court, in refusing to apply collateral estoppel, found that privity between these plaintiffs and the EPA was lacking.

(Aplt.App., Vol. 2 at 210–11.) Because the issues between the two cases are not identical, we need not decide the privity issue.

amount of carbon monoxide coming from the Konus heater. The Arraj decision neither addressed the other chemicals being emitted from the Konus heater nor emissions from other stacks. Further, the Arraj decision did not address Colorado regulations, opacity, smoke, odor, lights, or noise.

In this case, Miller testified about the overall emissions from the stacks, and we cannot find any reference in the record of his testimony about carbon monoxide emissions from the Konus heater. Reynolds testified about the wafer dryer, not Konus heater, stack test. Therefore, the issues introduced by the plaintiffs were not identical to the issue decided in the Arraj decision.

■■■ Moreover, we do not believe that L–P was prejudiced by being unable to mention the Arraj decision as an impeachment tool. Though plaintiffs' were not collaterally estopped from presenting evidence of the March, 1985, stack tests, by the same token, L–P was allowed to present its evidence to the jury showing the tests' invalidity. Accordingly, we hold that the district court did not err in either allowing the plaintiffs to introduce evidence of the March, 1985, stack tests or in preventing mention of the Arraj decision in L–P's cross-examination of Miller and Reynolds.

L–P also claims that even if the plaintiffs were properly permitted to introduce the March, 1985, stack tests, the district court improperly prevented introduction of those portions of the Arraj decision which were favorable to L–P. L–P argues that it wanted to introduce the Arraj decision to show that it was not liable for negligence *per se* because the EPA had failed to establish regulatory violations at the Olathe plant and imposed no fine in conjunction with that plant.

The Arraj decision dismissed the Olathe claim because the EPA could not use the invalid carbon monoxide results to prove a violation. We do not interpret this as deciding that the Olathe plant was not fined because it was in compliance with state and federal regulations. Therefore, the Arraj decision was irrelevant as proof of overall com-

pliance to rebut plaintiffs' negligence *per se* claim. The district court did not abuse its discretion by excluding it.

L–P also argues that it attempted to offer the Arraj decision to show that it believed it was acting reasonably, and not recklessly, towards the public when it installed the EFB. However, the Arraj decision was only minimally relevant to L–P's subjective belief because it was after-the-fact, conclusory evidence about the EFB. Moreover, because the Arraj decision did not decide that the EFB was BACT, its introduction would likely give an unwarranted stamp of approval to L–P's use of the EFB. In any event, L–P was not prejudiced because the district court allowed L–P to introduce extensive evidence of its subjective belief about the EFB before its installation. (Aplt.App., Vol. 2 at 287–89, 394; Vol. 3 at 475–86, 499–505; Vol. 4 at 614.)

From this record, we are convinced that the district court did not err in excluding the evidence of the Arraj decision in these specific instances. The court allowed neither side to use the Arraj decision. The jury was allowed to make its own objective decision.

## V.

The jury awarded each plaintiff $156,000 in punitive, or exemplary, damages based on its findings of "[c]ircumstances of fraud" and "[w]anton and reckless disregard for [the] rights and feelings of others." (Aplee.Supp.App., Vol. VI at 1400.) The actual damages ranged from $10,000 for the Pridy children to $98,320 for Arthur O. Orjias with the punitive to actual damage award ratios ranging from 15.6:1 to 1.6:1.

L–P argues that the district court erred in submitting the issue of punitive damages to the jury or, alternatively, in refusing to remit the punitive damages award in accordance with Colorado law.

### A.

■■■ L–P claims that in Colorado the standards for outrageous conduct[3] and puni-

---

**3.** Since 1970, Colorado has recognized the tort of outrageous conduct, also called the tort of

intentional infliction of emotional distress. *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753, 756

tive damages are so similar that, when the district court dismissed the outrageous conduct claim, it was error not to have also dismissed the punitive damage claim.

L–P argues that Colorado has adopted the Restatement (Second) of Torts § 908 (1977), Punitive Damages, which states:

> (1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
>
> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others....

We are not convinced that Colorado has adopted this language from the Restatement. "In Colorado, exemplary damages are a creature of statute." *Mince v. Butters,* 200 Colo. 501, 616 P.2d 127, 128 (1980).

During the applicable time period, Colo. Rev.Stat. § 13–21–102 (1973), *Exemplary damages,* provided:[4]

> In all civil actions in which damages are assessed by a jury for a wrong done to the person, or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the

injured party's rights and feelings, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

*Alley v. Gubser Dev. Co.,* 785 F.2d 849, 855 (10th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986).

A "wanton and reckless" disregard involves conduct that "creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences." *Palmer v. A.H. Robins Co.,* 684 P.2d 187, 215 (Colo. 1984). In general, punitive damages are allowable under § 13–21–102 when the acts causing the injury were performed "with an evil intent and with the purpose of injuring the plaintiff, or with such a wanton and reckless disregard of his rights as evidence a wrongful motive." *Frick v. Abell,* 198 Colo. 508, 602 P.2d 852, 854 (1979) (quoting *Ress v. Rediess,* 130 Colo. 572, 278 P.2d 183, 187 (1954)).

Further, Colo.Rev.Stat. § 13–25–127(2) (1973), *Civil actions—degree of proof required,* provides: "Exemplary damages ... shall only be awarded in a civil action when the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in section 13–21–102...."

---

(1970); *Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381, 383 (10th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 838 (1989). In *Rugg,* the Colorado Supreme Court adopted the *Restatement (Second) of Torts* § 46 (1965):

> Outrageous Conduct Causing Severe Emotional Distress
>
> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Rugg,* 476 P.2d at 756.

The court in *Rugg* also adopted comment (d) to § 49 which defines extreme and outrageous conduct:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average

member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Rugg,* 476 P.2d at 756.

4. In 1986, the Colorado legislature amended this statute. Colo.Rev.Stat. § 13–21–102 (1987) currently provides, in pertinent part:

> (1)(a) In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

Section 2 of Laws 1986, H.B. 1197 provides: "This act shall take effect July 1, 1986, and shall apply to civil actions accruing on or after said date."

Because the standard for awarding punitive damages is not the same as that for the tort of outrageous conduct, we hold that the district court did not err in granting L–P's motion to dismiss the outrageous conduct claim while denying L–P's motion to dismiss the punitive damage claim.

■ Next, we address the sufficiency of the evidence under the statutory standard.

Viewing the evidence in a light most favorable to the plaintiffs, we must determine whether a jury could find beyond a reasonable doubt that L–P's conduct was attended by circumstances of fraud, malice or insult, or a wanton and reckless disregard of the injured plaintiffs' rights and feelings. *Alley*, 785 F.2d at 856.

In this record we find significant evidence of circumstances of fraud and a pattern of behavior that indicated that L–P was wanton and reckless in its pursuit of profit over concern for whether it was creating either a public health risk or a nuisance to its neighbors. There is evidence that L–P intentionally violated state pollution standards; manipulated emissions output, monitoring instruments, and light to conceal pollution problems; disregarded the neighbor's complaints; and withheld information from Colorado Health officials. We hold that there is sufficient evidence in the record for a jury to find beyond a reasonable doubt that L–P's conduct was attended by circumstances of fraud and wanton and reckless disregard of the injured plaintiffs' rights and feelings.

### B.

■ L–P argues that the amount of the punitive damage award should now be remitted to establish the "reasonable relationship" required under Colorado law. L–P contends that the award of punitive damages cannot be reasonable in this case because disparate ratios ranging from 1.6:1 to 15.6:1, within the same verdict, are inherently unreasonable.

The purpose of punitive damages is to punish the wrongdoer and deter similar future conduct. *Frick*, 602 P.2d at 854. "The proper factors to be considered include: (1) the nature of the act which caused the injury; (2) the economic status of the defendant; and

(3) the deterrent effect of the award on others." *Malandris*, 703 F.2d at 1177.

■ Under the *Malandris* factors, the focus for punitive damages is on the defendant's behavior and the punishment and deterrent effects of the award. *Malandris*, 703 F.2d at 1177. Within this framework, however, there are limits to the award of punitive damages. When evaluating punitive damages, the ultimate question becomes whether the punitive damages awarded are so excessive that they shock the judicial conscience or lead to an inescapable inference that they resulted from improper passion or prejudice on the part of the jury. *Id.* If we determine that punitive damages are reasonable and bear some relationship to the actual damages awarded, we can assume with some certainty that the jury did not base its award on improper passion or prejudice.

■ Specific ratios of punitive-to-actual damages, while providing no bright-line answers, are a factor to consider when evaluating the reasonableness of the relationship. *Palmer*, 684 P.2d at 220. "Indeed, in some cases the purposes of punishment and deterrence may only be achieved when the award is such as to adequately impress upon the defendant and others the seriousness and harmful consequences of a particular form of misconduct." *Id.* Moreover, in our evaluation, "[it] is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *TXO Production Corp. v. Alliance Resources Corp.*, —— U.S. ——, ——, 113 S.Ct. 2711, 2721–22, 125 L.Ed.2d 366 (1993).

Though L–P's arguments on appeal are slightly different from those it presented to the district court, the district court, in its post-trial Order, placed the facts of this case into the *Malandris* framework when it observed:

In reviewing the jury's punitive damages verdict in this case, I note, again, that the verdict does not represent a rounded figure picked out of thin air. The jury

awarded $156,000 to each plaintiff, for a total of $1,872,000. While I am unable to reproduce the jury's exact mathematical calculation, the award is less than 0.2% of the net worth (stockholders' equity) revealed in Louisiana–Pacific's financial statement of June 30, 1987. To put the matter in terms which my "judicial conscience" has some chance of understanding, an award of 0.2% in this case would be equivalent to imposing a fine of $200 upon a person with a net worth of $100,000, a fine of $1000 on a person with a net worth of $500,000, and a fine of $2000 upon a person with a net worth of $1,000,000. Thus, given Louisiana–Pacific's significant net worth and the deterrent purpose to be served by punitive damages, an award of $1,872,000 is entirely reasonable; it is simply not so excessive as to shock the judicial conscience-of this court, at least.

Defendant's challenge to the punitive damages award focuses primarily on the first of the three *Malandris* considerations—the nature of the act which caused the injury. Defendant's focus is a little skewed, however, since its argument actually fixes on plaintiffs' injury, not on the nature of defendant's acts which caused the injury. Thus, defendant stresses that the jury's verdict did not reflect any awards for permanent physical impairment or medical expenses. As I have previously indicated on the record, I agree with this contention: defendant was not operating this plant with the knowledge that its actions would probably cause death or serious, permanent injury to adjacent landowners and residents. That Louisiana Pacific's acts were not as reprehensible as they might have been, however, does not logically compel the conclusion that an award of punitive damages is either inappropriate or excessive. As the authorities cited by plaintiffs illustrate, serious or long-term personal injuries are not a necessary predicate for a punitive damages award. The jury was evidently satisfied, on adequate evidence, that each plaintiff deserved a substantial award for discomfort, passing or temporary physical illness, passing or temporary pain and suffering, inconvenience, annoyance, emotional distress, and loss of enjoyment of the quality of life or of property. Mainly through the efforts of Margaret Orjias and others, Louisiana Pacific was plainly on notice that its operations were causing these sorts of injuries. Far from acknowledging the problem and being candid in its relations with the Colorado regulatory authorities, Louisiana Pacific chose to conceal the extent of the problem. The jury could properly find that Louisiana Pacific knew of the noneconomic injuries which plaintiffs were suffering, did nothing about the injuries, and affirmatively concealed the extent of its polluting activity from the Colorado regulatory authorities. Thus, I do not believe that defendant's attempt to focus on the nature of the act which caused the injury detracts from the reasonableness of the punitive damages in this case.

(Aplt.App., Vol. 1 at 44–46.)

We agree. Moreover, high ratios have been upheld where the record shows that the jury properly based its verdict on the purposes underlying punitive damages. *See, e.g., Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1366 (10th Cir.1987) (affirming ratios of 50,000:1 and 50:1); *Palmer,* 684 P.2d at 220 (affirming a ratio of 10:1); *Mailloux v. Bradley,* 643 P.2d 797 (Colo.App. 1982) (affirming ratios of 10:1 and 35:1). Aggregation of punitive damages to determine an overall ratio has also been considered. *See Alley v. Gubser Dev. Co.,* 569 F.Supp. 36, 40 (D.Colo.1983) (reversing a 17:1 individual with a 10:1 aggregated overall ratio as excessive in view of the evidence), *rev'd on other grounds,* 785 F.2d 849 (10th Cir.), *cert. denied,* 479 U.S. 961, 107 S.Ct. 457, 93 L.Ed.2d 403 (1986).

In this case, the jury likely arrived at a reasonable punitive damage award of $1,872,000 and then divided that award equally among the plaintiffs. Comparing this to the overall actual, or compensatory, award of $396,100 gives an overall punitive-to-actual ratio of 4.7:1. This ratio is not unreasonable or excessive. It is also not unreasonable for a jury, in light of the purposes for punitive damages, to determine the overall punitive award while at the same time considering each plaintiff's actual damages because L–P's

actions were not directed toward any particular individual.

We hold that the punitive damage award was not unreasonable or excessive. The award was not a result of improper passion or prejudice on the part of the jury.

**AFFIRMED.**